IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SANDRA STEPHENSON, )
Administratrix of the Estate of )
MARGARET J. YARTIM, Deceased, )
)
                    Plaintiff, )
) CIVIL ACTION NO. 3:2006-55
v. )
)
SUNBEAM PRODUCTS, INC., )
JARDEN CORPORATION, ) JUDGE GIBSON
SUNBEAM PRODUCTS, INC., )
a registered fictitious name d/b/a )
JARDEN CONSUMER SOLUTIONS, )
)
                    Defendants. )

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

**SYNOPSIS**

This matter comes before the Court on three separate motions by the Defendants that challenge the Plaintiff's three experts, Mr. Stewart (hereinafter "Stewart"), Trooper Andolina (hereinafter "Andolina") and Dr. W.T. Cronenwett (hereinafter "Cronenwett") specifically seeking to limit the extent of these experts' testimony on various subjects including, inter alia, their ability to conclude that the heating blanket in question was "on", that it was not abused or misused, that the heating blanket was defective and that any such defect was the cause of the fire in question or that the heating blanket was the source of ignition for the fire. *See* Document No. 94, pp. 2, 13, No. 96, pp. 1-2, 9,, No. 98, pp. 1-2, 12, No. 192, pp. 2-3.

## LEGAL STANDARDS

Federal Rule of Evidence 702 controls the admission of expert testimony and provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In the watershed case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court recognized that this rule superceded the previous standard of "general acceptance" set forth in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (D.C.Cir. 1923) and used to evaluate the admissibility of expert testimony prior to the *Daubert* ruling. This Court has previously reviewed the standard set forth in *Daubert*:

> The Supreme Court in *Daubert* concluded that the trial judge should act to screen evidence to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert* at 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469, 480 (1993).[2]
>
> [2]The review of Rule 702 in *Daubert* was confined to expert scientific opinion. However, in the case of *Kumho Tire Company, Ltd., et al. v. Carmichael, et al.*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court clarified that its Daubert analysis of Rule 702 was applicable to all types of expert opinions.
>
> The *Daubert* court then proceeded to analyze Rule 702 as being two separate parts: 1) scientific knowledge (whether the testimony is reliable, *i.e.* based upon "good grounds"); and 2) the ability of the testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue." (whether the testimony is relevant, *i.e.* whether there is a "fit" to use the term utilized by Judge Becker of the Third Circuit Court of Appeals).[3] *Daubert* at 589-591, 113 S.Ct. 2786, 2795-2796, 125 L.Ed.2d 469, 480-482. Thus, the Supreme Court in *Daubert* requires trial courts to initially determine the

2

validity of the methodology utilized by the expert and then whether the methodology applies to the circumstances in the case at bar. *Daubert* at 592-593, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482.

> [3] *See United States v. Downing*, 753 F.2d 1224, (3d Cir.1985) which is referenced *infra* in this opinion. Within the *Downing* opinion, the author, Judge Becker, used the term "fit" and this term was adopted by the Supreme Court in its opinion in *Daubert*.

While noting that a *Daubert* inquiry is a "flexible one" and that different factors will be applicable depending upon the circumstances, the Supreme Court set forth five non-exclusive factors that can be used in making this evaluation: 1) can the theory or technique in question be tested; 2) has the theory or technique been subject to peer review and publication;[4] 3) what is the known or potential rate of error for a particular technique; 4) are there standards that exist and are maintained that control the technique's operation; and 5) has the theory or technique been "generally accepted". *Daubert* at 593-594, 113 S.Ct. 2786, 2796-2797, 125 L.Ed.2d 469, 482-483. In addition, the Court specifically recognized that the focus of the inquiry was not to be upon an expert's conclusions: "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469, 484 (1993). Finally, the Court concluded that expert testimony, which is admissible but "shaky," can be tested by means of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert* at 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469, 484.

> [4]The *Daubert* Court recognized that publication "is not the *sine qua non* of admissibility." *Daubert* at 593, 509 U.S. 579, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469, 483.

*Wicker v. Consolidated Rail Corp.*, 371 F.Supp.2d 702, 708 -709 (W.D.Pa. 2005).

## ANDOLINA'S OPINIONS

Plaintiff is not seeking to offer Andolina as an expert on any malfunctioning or misuse of the blanket, but only for his opinion "that the fire ignited and originated on the top of the bed, in the area of the electric blanket." Plaintiff's Brief in Opposition (Document No. 131), p. 5. The Defendants agree that Andolina's testimony at the *Daubert* hearing establishes that he does not opine as to defects

3

within the blanket or misuse by the decedent. Defendants' Supplemental Brief (Document No. 150), pp. 2-3. Attendant with those subjects, it appears that Andolina is not opining as to any malfunctioning of the blanket. Thus, the Court agrees that Andolina's testimony at the *Daubert* hearing and his opinions are in the nature of opining that the blanket was "on", that it was the source of the ignition of the fire and that it caused the fire. Defendants' Supplemental Brief, p. 2.

The Court agrees with the Plaintiff that the Defendants did not attack Andolina's qualifications. Plaintiff's Brief in Opposition (Document No. 148), p. 2. The Defendants did attack Andolina's conclusion that the blanket was "on" by noting that Andolina's only bases for his conclusion were that the blanket was plugged in and he observed arcing on the PTC wiring within the blanket. *Id.* at pp. 3-4. This appears to be an attack on the reliability of Andolina's opinion, that is whether he has good grounds for his conclusions that the blanket was "on' and caused the fire.

There is no doubt that the Defendants disagree with Andolina's conclusions and they pressed him in their examination at the *Daubert* hearing on February 15, 2008 regarding the depth of his understanding of the state of the blanket's controller and the switch within it as well as his observation and understanding of the beading on the PTC wire he testified that he observed.

Andolina's opinion does not speak to the origin of the ignition within or without the blanket, but only that the blanket was the point of origin. His opinion that the blanket was "on" is consistent with his observations that the blanket was plugged in and he observed arcing on the PTC wire in the blanket. *Daubert* Transcript (Document No. 142), pp. 163-164. Of course, Andolina admits that he did not test the beading he observed to prove that it was a result of electrical energy or a result of fire impingement. *Id.* at pp. 162-163. However, the conclusion Andolina reaches is based upon his

4

investigation and his experience in investigating fire scenes to determine the cause and origin of fires. Such techniques specific to fire scene investigation, despite the absence of tests or uniform application of scientific sampling and validations, have been approved as an acceptable method of formulating expert opinions on the subject of fire cause and origin. *See Hickerson v. Pride Mobility Products Corp.*, 470 F.3d 1252, 1257-1258 (8th Cir. 2006)(accepting fire cause and origin experts conclusions that a product caused fire based upon fire damage and exclusion of other possible ignition sources)[1]; *see also Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004).

Andolina is aware that the blanket controller was attacked by heat and fire and he did not study the switch within the controller, Transcript at pp. 169, 172, but he still observed and deduced that the blanket was the source of the fire in this instance without specifically studying the electrical origin of the fire. Andolina in his cross-examination by Attorney Moffett admits that there could be two alternatives to the energizing of the blanket with one scenario being that the blanket was turned "on" and another scenario with the blanket's controller in the "off" position. *Id.* at p. 169. The focus of Andolina's investigation was that of the presence of a crime, and whether the physical evidence would

---

[1]

The *Hickerson* court stated:

> The methodology [Mr. Schoffstall] used to generate his opinion is sound. He examined burn patterns, examined heat, fire, and smoke damage, considered this evidence in light of testimony regarding the fire, and identified a point of origin. He then considered as possible causes of the fire those devices that contained or were connected to a power source and that were located at the identified point of origin. He eliminated as possible sources those devices that were not in the area of origin or that were not connected to a power source and contained no internal power source. We can find nothing unreliable in this accepted and tested methodology.

*Hickerson v. Pride Mobility Products Corp.*, 470 F.3d 1252, 1257 (8th Cir. 2006). The Eighth Circuit permitted Mr. Schoffstall to present testimony that the PowerChair product was the origin of the fire through a cause and origin analysis of the fire damage, but not through an analysis of any defect of product design. *Id.* at 1258, n.2.

5

support the finding that a crime occurred with the passing of the decedent. *Daubert* Transcript, pp. 145-146. The possibility of an alternative conclusion to that of Andolina's conclusion does not cause his opinion to be without reliability or not "fit" for trial. The Defendants' attempt to undercut Andolina's opinion through an implicit reference to Cronenwett, *see* Defendants' Supplemental Brief, p. 10, ignores the fact that Andolina's opinion, while based upon a method he as well as other certified fire investigators employ, does not attempt to fault the blanket's manufacturer or user, but to draw a conclusion as to the criminality of the fire's place of origin and cause. Andolina used his method of observation and deduction to place the origin of the fire on the decedent's bed, at a point on the bed where only the remains of one potential source of the conflagration existed, and that potential source was the Defendants' product. Andolina has not and cannot testify if the blanket was defective in its design or manufacturing or otherwise misused by the decedent, but he found evidence through his investigative technique that was consistent with the blanket being energized and, in his belief, consistent with it being turned "on". As recognized by the Supreme Court in *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-149 (1999), Rule 702 does not require every expert opinion to be based upon a definable "science" as the text of the rule clearly provides for experience and training to be a basis for an expert opinion. Andolina has provided a basis for his conclusion and such basis was observed during his investigative process. Despite the Defendants' belief that a disconnect exists between the observation of beading on the PTC wiring and the conclusion that the blanket was on, the Court finds that reliable grounds exist for Andolina's opinions.

Finally, we turn to Andolina's conclusion that the blanket ignited and caused the fire that resulted in the decedent's death. Andolina's investigation accounted for the possible sources of ignition

6

and the concomitant cause of the fire. His observations led him to the decedent's bed, specifically the top of the bed as the underside of the bed and the bed springs show limited damage by fire and the one light bulb above the bed was melted consistent with heat rising from on top of the bed. *Daubert* Transcript, pp. 130-149. Andolina's observations of the bed and surrounding area allowed him to conclude based upon his education and experience with fire investigation that no cigarettes, matches, additional appliances or other matters other than the Defendants' product was present in that area of origin on top of the bed. *Daubert* Transcript, pp. 148-149. Therefore, he had a reliable basis upon which to conclude that the blanket was the source of ignition and the cause of the resulting fire.

The Defendants' objections do not appear to reflect an objection as to the "fit"of the opinions. To the extent that the Defendants' objections could relate to "fitness", they are correct to the extent that Andolina's opinions are based upon an understanding of electrical engineering and Andolina acknowledges such limitations and the Court sustained an objection to causation from an electrical engineering standpoint. *Daubert* Transcript, p. 148-151. The Court continues in that position here by limiting Andolina's opinion from concluding that the blanket malfunctioned or was misused. However, Andolina's opinion that the blanket ignited and caused the fire, based upon his law enforcement /certified fire investigator experience and training, does not equate with the conclusion that the blanket was at fault by the fact of its design or manufacturing or that it was misused by the decedent. Andolina's opinion at trial cannot address defectiveness or misuse. Andolina's opinion, if accepted by a juror, takes that juror to the blanket as the item to focus upon in determining liability, but does not definitively attribute that liability to either the Defendants due to malfunction or the decedent due to misuse or abuse. Thus, such limitations of Andolina's opinion can be addressed on cross-examination

at trial. The Defendants' opposition to his conclusions can also be tested through the questioning similar to that he has already faced regarding the investigation of other potential ignition sources he excluded and the arcing between the power and blanket cords of the blanket as an alternative source for the energizing of the blanket contrary to his conclusion that the blanket switch was turned "on".

The Defendants' motion is denied in part as Andolina's opinion is admissible under Rule 702 to the extent that he opines that the blanket was "on" at the time of the fire, it was the source of the fire's ignition and it caused the fire that killed the decedent. The Defendants' motion is otherwise granted in part as Andolina is not permitted to testify to any conclusion or opinion regarding the presence of a design or manufacturing defect in the blanket, malfunctioning of the blanket or the presence or absence of misuse of the blanket by the decedent or others.

## STEWART'S OPINIONS

The Defendants' next motion similarly seeks to exclude Stewart's opinions as to the same matters challenged in their motion concerning Andolina's opinions. Motion (Document No. 98); *see* also Supplemental Brief (Document No. 151).

The Court agrees once again with the Defendants that opinions related to the malfunction of or the defectiveness of the blanket cannot be pronounced by Stewart based upon his lack of expertise in the operation of said blankets. Stewart's lack of reliable grounds also precludes him from presenting opinions on malfunction and defectiveness as well as his lack of knowledge as to the care and use of the blanket precludes his opinion as to abuse or misuse of the blanket.

Turning once again to the three opinions as to the blanket being the source of ignition, the cause of the fire and the blanket's switch being "on" at the time of the fire, Stewart, just as Andolina did,

8

provides a sufficient expertise and knowledge on cause and origin, a reliable method for determining cause and origin as well as opinions that are based on reliable grounds that are 'fit" for the issue for which they will be offered. However, Stewart openly admitted during the *Daubert* hearing that he could not opine as to the position of the controller switch: "Q. Okay. You can't offer an opinion to this Court whether that blanket was on or not, correct? A. That's correct." *Daubert* Transcript (Document No. 142), p. 104; and again "Q. But in the final analysis, as you sit here today, you cannot testify whether that blanket was on at the time of the fire? A. That's correct." *Id.* at p. 106. Stewart by his admission limits the extent of his opinion and in turn precludes any future testimony from him on the issue of the position of the controller switch for the blanket.

Finally, the Defendants attempt to counter Stewart's opinion that the blanket was the source of the ignition and that the blanket was the cause of the fire. The Defendants do this by introducing the possibility that another ignition source, (*e.g.* a candle) ignited the flames and caused the fire. Motion, pp. 9-11; Document No. 99-6, pp. 25-26; Supplemental Brief (Document No. 151), p. 6. Although the Court agrees with the Defendants that Stewart claimed no expertise in the field of electrical engineering, Stewart did in fact note that he observed no candles at the fire scene. *Id.; Daubert* Transcript, p. 85. Furthermore, the hypothetical situation with a candle being the ignition source of the fire as proposed by Attorney Moffett was explained by Stewart to be inconsistent with the evidence at the fire scene: 'Q. If for some reason some fabric, some material somehow came into contact with an open flame it has the potential to catch the bedding materials on fire, doesn't it? A. That's possible. But I would expect it to be more widespread over the entire bed, not to be so selective in that one area." *Daubert*

9

Transcript, p. 105. The Court does not find that Stewart's conclusion that the blanket was the ignition source and cause of fire presents "an analytical gap between the data and opinion proffered" such that it must be excluded as unreliable *ipse dixit* of Stewart. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See* Supplemental Brief, pp. 7-8. Stewart's opinion is therefore permitted to be introduced at trial, but only to the limited extent that he concludes the blanket was the ignition source and the cause of the fire.[2] The Defendants' Motion is otherwise granted in part.

## CRONENWETT'S OPINIONS

The Defendants present several arguments in response to the three expert reports of Cronenwett set forth in their three pretrial statements of record. *See* Document Nos. 36, 164, and 187. As Cronenwett's opinions have been supplemented, the Defendants' briefing of their Daubert challenges to those opinions have evolved to include different requests for the exclusion of his testimony. From a reading of the Defendants' Motion to Limit and its supporting briefs (Document Nos. 94, 149, 192), the Court understands the following to be the Defendants' arguments in support of limiting Cronenwett's opinions: 1) Cronenwett cannot establish that the decedent's blanket was "on" prior to the fire (*see* Document No. 149); 2) he cannot conclude that the blanket was the cause of the fire (*see*

---

[2]Consistent with Andolina's observation of the blanket being plugged into an electrical outlet and Andolina and Stewart's mutual conclusions that the blanket was the source of ignition and the cause of the fire, it appears to the Court that there are at least three viable theories consistent with these conclusions: 1) the blanket was turned on at the time of the fire and the fire resulted from a defect within the blanket that caused the ignition of the fire; 2) the blanket was off at the time of the fire, but became energized after a fire or the heat therefrom impinged upon the insulation on the blanket's power and blanket cords resulting in a melting of the insulation of those wires exposing the electrical wire within that in turn resulted in a short circuit of the wires when they came into contact which resulted in the blanket being energized by that short circuit in the absence of the controller being turned on; or 3) the insulation on the power and connecting cords was previously stripped from the wire prior to the fire (possibly from misuse or abuse) and a short circuit formed by their contact resulted in the energizing of the blanket without the blanket being turned on and the resulting energizing of the blanket in turn ignited the fire.

10

Document No. 149); 3) Cronenwett cannot observe a bead on PTC wiring and conclude that it is the result of electrical arcing as opposed to a melt induced by heat (*see* Document No. 192); 4) Cronenwett cannot conclude that the fire was hot enough to melt PTC wire because he is unaware of the temperature necessary to melt the PTC wire and actual temperature of the fire in the case *sub judice* (*see* Document No. 192). The Defendants also contend that Cronenwett's conclusion that it was "unlikely" that the power and blanket cords[3] melted in a manner that permitted power to be conducted into the blanket cord is belied by the fact he admitted it occurred in the case *sub judice*. Nowhere in the evolving opinions of Cronenwett and arguments in favor of their exclusion is an outright objection to Cronenwett's qualification as an expert based upon his education or his experience and knowledge about PTC wiring. Therefore, this Court will proceed to the question of whether Cronenwett's opinions have a reliable basis and the necessary fit to the present issues.

Cronenwett admits that the "power" cord and the "blanket" cord of the blanket melted together as result of a short circuit and using this fact the Defendants attempted to goad Cronenwett into admitting that the beading observed by Andolina "means nothing" and is otherwise "of no significance". Document No. 197-4, p. 37. Cronenwett clarified his opinion in the March 5, 2008 report (Document No. 197-2, p. 3) as meaning that he found that the blanket was energized, whether by the fact it was turned "on" at its controller or by the short circuit melt of the power and connecting

---

[3]Cronenwett uses the terms line cord and blanket cord to refer to the two cords that are connected to the controller of the product in question. The line cord, or what this Court has referred to as the power cord is that cord which plugs into an electrical receptacle on one end and on the other end is inserted into the controller. The blanket cord or what the Defendants refer to as the connecting cord connects the controller to the heating blanket. The Court uses the terms power cord and blanket cord in this opinion as they appear to present a clearer reference in explaining the difference between the two cords.

11

cords. Document No. 197-4, p. 35. Cronenwett eventually admitted that the two beads he observed on the five inch piece of PTC wire first presented to him in February 2008 were "consistent with electrical activity". Document No. 197-5, p. 43. However, Cronenwett's explanations as set forth in his last deposition on June 2, 2008, admit that he has no basis in science, experience or otherwise to conclude that the controller to the blanket was in the "on" position prior to the fire. Indeed the ambiguity surrounding the issue of whether the switch to the blanket controller was turned on was clear in Cronenwett's first expert report dated March 26, 2007 wherein he wrote: "12. The short circuits seen on the line cord and the blanket cord prove that the blanket was plugged in at the time of the fire and that the electricity to the outlet was ON. The short circuits on the blanket cord do not necessarily show that the blanket itself was ON at the time of the fire." Document No. 36-2, p. 3. Therefore, the second sentence of the sixth paragraph on page two of the March 5, 2008 report of Cronenwett is inadmissible at trial ("In layman's words, the electric blanket was turned "ON" with electrical power flowing in the heating element, at the time these beads were created."Document No. 197-2, p. 3.) along with any expert opinion testimony to that same effect.

Turning to the first of the next three objections to Cronenwett's testimony, namely his opinion that the blanket was the cause of the fire, the Court observes that Cronenwett's first report of March 26, 2007 recognized that "[t]he evidence is consistent either with the fire having been originally caused by the electric blanket or with a blanket damaged by a progressive attack by an original external fire." Document No. 36-2, p. 3. That report further reads: "14. If other evidence establishes that the blanket started the fire then the most probable source of ignition is a malfunction of the PTC cable and subsequent failure of the safety module to prevent ignition of the blanket." *Id.* Cronenwett observes

12

also that

> the only clear proof that emerges from this evidence is (1) that the electric blanket was plugged in to an energized outlet as the time of the fire as shown by the electrical short circuits and (2) that the first short circuit did not take place on the blanket cord as shown by the intact control fuses. The evidence, however, is consistent with (1) ignition by a PTC cable malfunction and (2) ignition of flammable material by molten copper splash ejected from the control.

Document No. 36-2, p. 5. Cronenwett then proceeds to limit his explanation of the blanket being the cause of the fire to five scenarios, but observes that he cannot point to one of the five as being the clear explanation for the blanket being the cause of the fire. *Id.* at pp. 5-6. While the details of these five scenarios need not be set forth for our present discussion, Cronenwett's belief in these possibilities presents a limited universe of alternatives to explain how the blanket could have caused the fire, but only if another expert opined that the blanket was the cause. Clearly, Cronenwett's basis for even rendering his opinion and presenting five alternatives is an assumption that a cause has been found. Thus, his opinion in the March 2007 report is founded upon the assumption that another expert has concluded the blanket was the cause of the fire and therefore, this opinion does not include an opinion of Cronenwett that the blanket was the cause of the fire.

However, Cronenwett's second report of March 2008 presented observations that Cronenwett offered what appeared to be conclusive evidence that the blanket was "on" prior to the fire through the observations in paragraphs two, three and four of the March 2008 report, *see* Document No. 197-2, p. 4, and to the extent that these three paragraphs attempt to establish that the blanket was the cause of the fire as well as interject the opinion that Cronenwett can visually observe a bead on PTC wiring and make a conclusion as to whether it was produced from the wire being energized and malfunctioning or

13

the PTC wire having been impacted by external flames, it must be excluded under Rule 702. Cronenwett based the conclusions in paragraphs two, three and four on his "experience as an electrical engineer" but he subsequently recognized in his deposition on June 2, 2008 that these conclusions were incorrect. Document No. 197-4, pp. 10-13. In fact, Cronenwett qualified his conclusions to the point that he said he could not observe beads on PTC wiring *in isolation* and conclude that the beads were produced from arcing resulting from the PTC wiring being energized or attacked by fire. *Id.* at pp. 10-13, 62. This limitation is listed as the second conclusion and opinion of Cronenwett in his May 30, 2008 report. Document No. 197-6, p. 5. Thus, the Court will exclude paragraphs two, three and four of the March 2008 report as being without reliable grounds under Rule 702 in light of Cronenwett's subsequent recognition of the limitation of those opinions, that is Cronenwett may not state any opinion that he may observe a bead on a PTC wire to conclude that the bead was produced by a blanket malfunction as opposed to an external fire attacking the blanket, but Cronenwett is permitted to opine as to the origin of a bead when presented facts concerning the nature of the conditions in which it was found, including the character of the blanket and the remnants of its PTC wire, its surroundings and the opinions (lay or expert) of others concerning the cause of the fire or other conclusions.

Finally, Cronenwett's May 2008 report returns to the opinion of the March 2007 report in the fact that Cronenwett recognizes that the beads observed by him are indicative of either the PTC wiring arcing after being energized or the PTC wiring being attacked by an external fire. *See* Document No. 197-6, p. 5. Cronenwett does add in the May 2008 report that he had attempted test burns of PTC wiring with external yellow flame from a candle and a blue flame fueled by methane or propane. As a result of these test burns, Cronenwett concluded that a yellow flame does not cause any beading on

14

PTC wiring when it is not energized, but that a blue flame is required to create beading on such wire in the absence of it being energized. Document No. 197-6, p. 5. This leads the Court to the Defendants' challenge of Cronenwett's opinions concerning his lack of knowledge of the temperature of the fire and whether it could have melted the PTC wiring.

Cronenwett did testify that he did not know if the temperatures in the fire in issue were sufficient to melt the PTC wiring. Document No. 197-5, p. 18. Cronenwett did however recognize that the surviving pieces of PTC wire from the fire scene are otherwise free from beading with the exception of the one five inch piece that presented itself with two beads on it. Document No. 197-5, p. 12. Cronenwett once again is constrained in his opinions by his observations or lack thereof. Cronenwett notes that he did not know how hot the fire was, Document No. 197-5, p. 12, 67, but that the survival of PTC wiring from the fire is an indicator that is consistent with the conclusion that the fire was not hot enough to melt the copper alloy comprising the PTC wiring as opposed to a discovery of melted copper alloy discovered at the fire scene that was not noted. *Id.* p. 18. Cronenwett admits openly that he did not observe the fire scene to recognize such indicators. Thus, he has admitted the fact that he lacks any basis to make conclusions as to the temperature of the fire. To this end, Cronenwett must be prevented from presenting opinions as to the temperature of the fire in question and its ability to melt PTC wiring. However, this limitation will not preclude Cronenwett from being questioned regarding the extent of his knowledge as to the temperature of melting for the copper alloy comprising the PTC wiring or the known temperatures for yellow and blue flames as discussed in his May 2008 report.

Finally, the Court agrees in part with the Defendants' argument that Cronenwett has admitted the fact that electricity was conducted into the blanket cord toward the blanket after an arcing between

15

the power cord and the blanket cord. *See* Cronenwett's Deposition, Document No. 197-5, pp. 27-28. Nonetheless, Cronenwett has previously testified that he disagrees in part with the Defendants' expert's opinion regarding the sequence of events (labeled A, B, C, and D by Dr. Blanchard, *see* Figure 2, Document No. 46-3, p. 13) and what the nature of the evidence reveals concerning the issue of whether the blanket was energized because its controller was turned on or because it was turned off and an external source of fire impinged upon the blanket. *See* Cronenwett deposition testimony of September 18, 2007, Document No. 42-9, pp. 14-22. In that testimony regarding his March 2007 report, Cronenwett presents his belief that the physical evidence is consistent with the blanket having been turned "on" or "off" at the controller. *Id.* Consideration of Cronenwett's entire opinion on this issue reveals his opinion that the arcing and melting of the power and blanket cords do not foreclose the possibility that the blanket was in fact energized because the controller was in the "on" position. Thus, the Defendants' argument in favor of limiting Cronenwett's testimony on this issue has already been recognized by Cronenwett in his opinions and previous deposition testimony, but Cronenwett's agreement in part with Dr. Blanchard's opinions and conclusions does not foreclose Cronenwett's opinion that the evidence is ambiguous. Indeed, to the extent that the Defendants' argument appears to have been made in an attempt to restrict Cronenwett's testimony at trial to the lone theory that the blanket was energized in a manner that occurred without the controller to the blanket having been turned in the "on" position, such an argument is without merit. Cronenwett made it clear in his September 2007 deposition that his opinions on this matter are consistent with the blanket either being turned "on" or "off". Therefore, this objection presents no basis for the Court to limit Cronenwett's opinions to only being supportive of a Defendant-friendly opinion. The motion to this extent is

16

therefore denied.

AND NOW this 26th day of September, 2008, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendants' Motion to Limit or Exclude Testimony and Opinions of Jacob Andolina (Document No. 96) is DENIED IN PART as to Andolina's opinions regarding whether the blanket was the source of ignition, "on" at the time of the fire, or the cause of the fire in question and GRANTED IN PART as to opinions concerning whether the blanket possessed a defect, had malfunctioned or had been misused or abused by the decedent; the Defendants' Motion to Limit or Exclude Testimony and Opinions of Robert G. Stewart (Document No. 98) is DENIED IN PART at to Stewart's opinions concerning whether the blanket was the source of ignition, or the cause of the fire in question and GRANTED IN PART as to opinions concerning whether the blanket was "on" at the time of the fire, possessed a defect, had malfunctioned or had been misused or abused by the decedent; the Defendants' Motion to Limit or Exclude Testimony and Opinions of Dr. William T. Cronenwett (Document No. 94) is GRANTED IN PART as to opinions concerning whether the blanket was conclusively "on" at the time of the fire, was the cause of the fire, that a bead on PTC wire when viewed in isolation can be determined to be caused from an energizing of the wire or a result of the wire being attacked by fire external to the blanket and as to the temperature of the fire in question and its ability to melt PTC wiring and finally, that Cronenwett cannot deny the fact that the unknown sequence of events on the evening of the fire included the event that the power cord and blanket cord arced

together and that electricity was conveyed into the blanket cord as a resulting of this arcing and melting together of the two cords and DENIED IN PART as to remainder of the motion.

**BY THE COURT:**

**KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE**